UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                  CASE NO.     8:16-cr-81-T-24JSS

SAMUEL MURAD

## AMENDED PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by

Rachelle DesVaux Bedke, Attorney for the United States for the Middle District of

Florida, acting under authority conferred by 28 U.S.C. § 515, and the defendant,

SAMUEL MURAD, and the attorney for the defendant, Gregory W. Kehoe, Esq.,

mutually agree as follows:

**A.      Particularized Terms**

1.      Count(s) Pleading To

The defendant shall enter a plea of guilty to Counts One and Two

of the Information.  Count One charges the defendant with tax evasion, in

violation of 26 U.S.C. § 7201.  Count Two charges the defendant with witness

tampering, in violation of 18 U.S.C. § 1512(b)(3).

2.      Maximum Penalties

Count One carries a maximum sentence of 5 years' imprisonment,

a maximum fine of $250,000, a maximum term of supervised release of 3 years,

and a special assessment of $100.  Count Two carries a maximum sentence of

20 years' imprisonment, a maximum fine of $250,000, a maximum term of supervised release of 3 years, and a special assessment of $100. With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense(s), and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense(s), or to the community, as set forth below.

3. <u>Elements of the Offense(s)</u>

The defendant acknowledges understanding the nature and elements of the offense(s) with which defendant has been charged and to which defendant is pleading guilty. The elements of Count One are:

<u>First</u>: the Defendant owed substantial income tax in addition to the amount declared on his tax return, as described in the Information;

<u>Second</u>: the Defendant attempted to evade or defeat a substantial part of this income tax due and owing by him to the United States by performing some act to accomplish that intent, as described in the Information; and

<u>Third</u>: in attempting to evade or defeat such tax, the Defendant acted knowingly and willfully and acted with the intent to evade the assessment of taxes he knew he was required by law to pay.

The elements of Count Two are:

<u>First</u>: the defendant knowingly corruptly persuaded another person, or attempted to corruptly persuade another person;

<u>Second</u>: with the intent to hinder, delay, or prevent the communication of information to a federal law enforcement officer; and

> Third:    the information the defendant sought to prevent being communicated to a federal law enforcement officer was about the commission or the possible commission of a federal crime.

4.    Indictment Waiver

Defendant will waive the right to be charged by way of indictment before a federal grand jury.

5.    No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6.    Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

7. Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

8. Cooperation - Substantial Assistance to be Considered

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a

prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot

and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.    Use of Information - Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

10.    Cooperation - Responsibilities of Parties

a.    The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime. However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.    It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

Defendant's Initials _S/n_        6

(1)    The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)    The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement.  With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)     The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)     The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

11.     <u>Taxes - Payment and Cooperation</u>

The defendant agrees to pay all taxes, interest, and penalties found to be lawfully owed and due to the Internal Revenue Service for tax year 2012, which shall be an amount not less than $65,341.00.  The defendant further agrees to cooperate with and provide to the Internal Revenue Service any documentation necessary for a correct computation of all taxes due and owing

for 2012, and further agrees that the Court may make this term a condition of any sentence of probation or supervised release.

12.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), whether in the possession or control of the United States, the defendant or defendant's nominees.  In lieu of a forfeiture money judgment in connection with the offense described in Count Two of the Information, the defendant hereby withdraws the claims he filed on or about April 30, 2014, contesting the administrative forfeiture of the $60,139.03 seized from his Bank of America checking account ending in 5150 and $8,079.00 of the $73,420.00 in U.S. currency seized from the defendant's Bank of America safe deposit box on February 13, 2014.  The United States and the defendant agree that, following the defendant's sentencing, the United States shall turn the remaining $65,341.00 in seized currency over to the Clerk of the Court to be applied to restitution.

The defendant agrees and consents to the forfeiture of the assets described above pursuant to any federal criminal, civil, and/or administrative forfeiture action.  The defendant also hereby agrees to waive all constitutional, statutory and procedural challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance

Defendant's Initials  _Sm_                9

with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture (including substitute assets) and to transfer custody of such property to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the government's tax returns for the precious five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of his cooperation.

Defendant's Initials _Sm ._          10

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

## B. **Standard Terms and Conditions**

### 1. Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters

a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (18 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. To ensure that this obligation is satisfied, the Defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $200.00, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing.

The defendant understands that this agreement imposes no limitation as to fine.

2.  <u>Supervised Release</u>

The defendant understands that the offense(s) to which the defendant is pleading provide(s) for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.   Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.   Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.   Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant

exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party.  The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years.  The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court.  The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.      Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement.  The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office.  The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by

the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7. Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by

18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.  Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.  Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.  Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice

received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.  <u>Factual Basis</u>

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth below are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

## FACTS

Samuel Murad ("Murad") is a retired Drug Enforcement Administration ("DEA") Special Agent, who was responsible for investigating federal criminal offenses in the Middle District of Florida ("MDFL") and elsewhere. Despite written and oral warnings from DEA counsel that he was legally prohibited from doing so, Murad used his position as a former DEA Special Agent and advocated on behalf of J.P., a federal inmate Murad had investigated and helped to prosecute in the mid-1990's, in an effort to obtain a Rule 35 sentence reduction for J.P. During the course of these efforts, Murad received $223,800.00 in cash from J.P.'s brother, hid the money in a safe deposit box, failed to report this income on his federal income tax return, and then tried to corruptly persuade a special agent with the DEA not to talk to the FBI to prevent the disclosure of Murad's undeclared income and failure to pay taxes thereon.

In 1994, J.P. and several co-conspirators were indicted in the MDFL for their participation in a marijuana importation conspiracy beginning in at least August 1988 and continuing through December 1990. Murad was the DEA case agent assigned to the J.P. investigation. In or about November 1994, J.P. pleaded guilty to the drug conspiracy. In February 1996, J.P. was sentenced to a 30-year term of imprisonment. J.P. is currently incarcerated; his projected release date is in July 2020. J.P. has served much of his sentence at Coleman Federal Correctional Complex ("Coleman FCC") in the MDFL. J.P. has a brother, referred to herein as B.P.

Defendant's Initials _SM_       18

Sometime in or about 2009, K.B., J.P's attorney, asked Murad to assist J.P. in obtaining post sentencing relief from his term of incarceration. Murad then contacted an Assistant United States Attorney ("AUSA 1") in the United States Attorney's Office ("USAO") for the MDFL about the possibility of the USAO filing a motion, pursuant to Rule 35 of the Federal Rules of Criminal Procedure, for a reduction of sentence on J.P.'s behalf. During the course of that conversation, AUSA 1 recommended to Murad that he contact DEA to determine whether the post-employment restrictions in 18 U.S.C. § 207 would prohibit Murad from assisting K.B., J.P.'s attorney, in seeking such a sentence reduction because Murad had been involved in the investigation leading to J.P.'s conviction.

Following that advice, Murad contacted DEA on or about April 10, 2009. Murad completed a questionnaire regarding his role in the J.P. investigation and explained what he now wanted to do on behalf of J.P. On April 28, 2009, a DEA Associate Chief Counsel sent Murad a written opinion on that issue. Among other things, the DEA Ethics Opinion stated:

> Because of your prior role as an investigative agent in the criminal investigation of [J.P.] and the [P.] Group, your activities in this matter are restricted by the 207(a) prohibition as discussed in detail below.

> General Prohibition. 18 U.S.C. § 207 as implemented by 5 C.F.R. 2614.201(a) provides that no former employee shall knowingly, with the intent to influence, make any communication to or appearance before an employee of the United States on behalf of any other person in connection with a particular matter involving a specific party in which such matter the former employee

participated personally and substantially as a government
employee, and in which the United States is a party or has a direct
and substantial interest.

Applicability. The 207(a) restrictions squarely apply to [J.P. and
B.P.] as well as to other members of the [P.] group that were investigated.

* * *

Specific Restrictions. With respect to [J.P. and B.P.], and
any member of the [P.] Group that was investigated, you cannot
represent them or advocate on their behalf before DEA or other
agencies on matters which relate to their investigation, arrest,
and/or conviction. Specifically, this means you cannot "appear" –
be physically present – in a formal or informal setting on their
behalf, to include a meeting with a DEA or other federal agency
employee, or appearing on their behalf in this matter before a
Judge. Also, you cannot "communicate" with the government on
their behalf with the intent to influence the Government. . . . As
applied in this context, any communication by you to the
Government – even if in a consultant type role – will be construed
as "intended to influence" the Government as the purpose of the
contact would be to facilitate discretionary Government action on
behalf of [J.P.].

Behind-the-Scenes Assistance. The restrictions above,
however, do not prohibit "behind the scenes" consultation or advice
directly to, or in support of [J.P., B.P.], and family members who
were part of the [P.] Group. . . . Additionally, as an investigator of
the [P.] Group, you had access to and knowledge of, law
enforcement sensitive information. You should be aware that DEA
considers this type of information sensitive and non-public.
Accordingly, you are not authorized to disclose information
obtained in the course of your investigative duties as a DEA
S[pecial] A[gent].

On April 28, 2009, the DEA Associate Chief Counsel also emailed

Murad a copy of the letter and emphasized, "Bottom line, you cannot interact,

interface, or communicate with the Government on behalf of the [J.P.] family in

this matter. Also, you cannot divulge L[aw] E[nforcement] sensitive information

to anyone outside the Government." That evening, Murad responded to the email indicating that he would call DEA counsel the next day to discuss the opinion.

K.B., J.P.'s attorney, met with Special Agent Robert Joseph Quinn ("Agent Quinn") and another DEA special agent about plans to initiate an effort to obtain a Rule 35 sentence reduction for J.P. During this meeting, K.B. informed Agent Quinn that Murad—one of Agent Quinn's friends and former colleagues— was involved in the J.P. Rule 35 matter. After this meeting, Agent Quinn contacted Murad about the J.P. Rule 35 effort. During their conversation, Murad asked Agent Quinn to handle, on the DEA end, the effort to obtain a Rule 35 sentence reduction for J.P. As a result, and at various times, Agent Quinn and K.B. communicated with representatives of the USAO MDFL to explore the possibility of initiating a Rule 35 effort for J.P. These communications ultimately led to the USAO MDFL's approval of the use of a third-party cooperator in the J.P. Rule 35 effort. In particular, this approval authorized the introduction of a DEA Confidential Source to the target of a cocaine trafficking investigation being conducted by the DEA. As it turned out, the third-party cooperator and J.P. had been cell mates for many years prior to the cooperator's release from prison.

In March 2012, a DEA investigation facilitated by another individual, who was an associate of the third-party cooperator, resulted in the arrest of a person for attempting to purchase cocaine in the MDFL. Additional MDFL arrests—also facilitated initially by the third-party cooperator's associate—

Defendant's Initials _Jm_            21

occurred in May 2012 in a separate cocaine trafficking investigation. Murad believed that these arrests would lead to a Rule 35 motion for sentence reduction for J.P.

Murad, by improperly contacting Agent Quinn, kept abreast of the progress of both investigations and the progress of efforts to get J.P. a Rule 35 motion for reduction of sentence. Murad suggested to J.P.'s lawyer that, "you might want to let me know what you are going to do, not to get my approval of course, but I got my finger on the pu;lse [sic] here and I might be able to let you know the heart beat."

In June 2012, once arrests had been made and he believed a Rule 35 motion might soon be filed, Murad's frustration about not having been paid a significant sum of money for his involvement in the Rule 35 efforts peaked. Murad sent a series of emails to B.P. (J.P.'s brother) explaining that J.P. could not get a Rule 35 without Murad's help. Murad also demanded from B.P.: (1) a $700,000 payment ($100,000 to remain involved in the matter and $600,000 in various increments based on anticipated events in the Rule 35 proceeding); and (2) 50 percent "of any monies that are [kept] from the original forfeitures or money from additional properties . . . ." Murad wrote to B.P. in a June 6, 2012, email that "if we can't come [to] some kind of understanding, then you guys get to keep your money and [J.P.] stays in jail because good luck getting him out without my testimony." As Murad knew, the DEA Ethics Opinion from April 2009 made clear that Murad was barred from interfacing with DEA or appearing on

J.P.'s behalf before a judge in connection with any Rule 35 motion filed on J.P.'s behalf. However, Murad had been told by K.B., J.P.'s attorney, that she would subpoena Murad for any Rule 35 hearing and let the Court decide if Murad could testify.

After receiving Murad's demanding emails, B.P. arranged to meet Murad in St. Petersburg, Florida on August 15, 2012. During the meeting in St. Petersburg, Murad demanded to be paid $750,000 to stay involved in the Rule 35 matter. Murad justified this payment by claiming that he got the Rule 35 effort started through his contacts at the DEA and USAO MDFL. After negotiating with Murad, B.P. agreed to pay Murad $500,000 for his continued involvement.

On Friday, August 17, 2012, Murad and B.P. met at a restaurant in Gainesville, Florida. After lunch, Murad and B.P. got into B.P.'s vehicle. B.P. gave Murad a shopping bag containing $223,000.00 in cash, mostly $100 bills. Murad counted the cash in the vehicle and then asked B.P. how much money B.P. had in his wallet. B.P. showed Murad that he had $800 of U.S. currency in his wallet, which Murad then took and added to the shopping bag full of cash. As a gift, B.P. also gave a sharpening stone to Murad. Murad also told B.P. to tell J.P. to "shut up" on the telephone. Although Murad did not tell B.P. why he gave this instruction, Murad knew that J.P.'s jail calls were being reviewed by law enforcement as part of the investigation associated with the Rule 35 matter.

After finishing his meeting with B.P., Murad called Agent Quinn. During their telephone conversation, Murad informed Agent Quinn that the

meeting with B.P. went well. By the following day, Murad told Quinn he had received over $200,000.00 in cash from B.P and put the money in a safe deposit box.

That same day, on August 17, Murad went to a Bank of America branch in Clearwater, Florida to open a safe deposit box. Once the paperwork was completed, Murad put the money he received from B.P. in the safe deposit box.

Murad later confirmed with Agent Quinn that he had put the money received from B.P. in a safe deposit box. They both laughed about the fact that Murad had to get a larger safe deposit box because all of the cash would not fit into a smaller safe deposit box. Murad and Quinn also discussed Murad's decision to put the money he received from B.P. in a safe deposit box. Murad assured Agent Quinn that B.P. would deny ever paying Murad.

Coincidentally, on August 17, after Murad's meeting with B.P., an AUSA investigating the J.P. Rule 35 matter ("AUSA 2") called Murad to request a meeting. Although Murad initially stated that the DEA Ethics Opinion precluded him from meeting with any Government official to try to influence the case, he ultimately agreed that AUSA 2 did not need to subpoena him for the meeting.

On Monday, August 20, 2012, Murad met with AUSA 2, who asked Murad if he had been paid for his work on behalf of J.P. Murad indicated that he and B.P. had talked and worked it out. In particular, Murad represented to AUSA 2 that B.P. was going to pay J.P.'s lawyer, who in turn would pay Murad. Murad

did not reveal to AUSA 2 that he had received $223,800.00 in cash directly from B.P. just days prior.

Between August 17, 2012 and January 27, 2014, Murad accessed approximately 23 times the Bank of America safe deposit box in which he put the $223,800.00 in cash received from B.P. Between October 11, 2012 and December 3, 2013, Murad made 46 cash deposits into his Bank of America checking account, many of which occurred shortly after he had accessed his safe deposit box. No cash had been deposited into this account between January 2010 and September 2012 (prior to B.P.'s $223,800.00 cash payment to Murad).

On or about October 14, 2013, in Pinellas County, in the MDFL, Murad caused to be filed a Form 1040, U.S. Individual Income Tax Return, for Tax Year 2012 that falsely claimed his income for that tax year as $47,047.00, and that failed to reflect as income the $223,800.00 cash payment he received from B.P. in August 2012. In fact, Murad's taxable income for Tax Year 2012 was $270,847.00. Murad's failure to report the $223,800.00 in income resulted in the false understatement of tax due and owing to the United States as $5,349.00, when, in fact, the actual amount due and owing to the Internal Revenue Service ("IRS") was approximately $70,690.00 (a difference of $65,341.00).

Murad previously had told his accountant that he was expecting a large payment for representing, or consulting with, a federal inmate whom Murad had investigated as a DEA agent. The accountant had advised Murad that if Murad received such a payment, Murad would have to keep track of the payment

Defendant's Initials _Sm_     25

and associated expenses for tax reporting purposes. Murad, however, willfully failed to report to his accountant and the IRS that he received the payment of $223,800.00 in the 2012 Tax Year.

After Murad received his $223,800.00 cash payment from B.P., the FBI set up an interview with Agent Quinn on November 22, 2013. During that interview, the FBI asked Agent Quinn about payments made by J.P.'s family members to Murad, Agent Quinn's involvement in the Rule 35 efforts for J.P., and Agent Quinn's contacts with Murad about the Rule 35 matter. Among other things, Agent Quinn lied to the FBI agents about Murad never receiving any money, other than expenses, for his work on the J.P. Rule 35 matter. Agent Quinn intentionally did not reveal to the FBI that in August 2012 B.P. had paid Murad over $200,000 in cash for Murad's work on the J.P. Rule 35 matter. Further, Agent Quinn told agents that once he was transferred to a new assignment and the J.P. matter was transferred to another DEA special agent, he had nothing more to do with the matter—which was not true.

After his interview with the FBI, Agent Quinn met with Murad in Pinellas County, Florida. In particular, Agent Quinn informed Murad that the FBI had specifically talked about Murad and asked whether Murad had ever been paid by J.P.'s family. Agent Quinn told Murad he thought the FBI knew about the money and that the FBI had talked to B.P. During this conversation, Agent Quinn asked Murad if he ever did anything with the money B.P. had paid him. Murad responded that he still had the money in his safe deposit box. Based on their

conversation, Quinn understood that Murad had not paid taxes on the money he received from B.P. During this meeting, Murad directed Agent Quinn not to talk to the FBI. Agent Quinn responded that he had to talk to the FBI because he was an agent; however, Agent Quinn assured Murad that he would not tell the FBI about the money.

By instructing Agent Quinn not to talk to the FBI, Murad knowingly attempted to corruptly persuade Agent Quinn not to (1) provide the FBI with information about B.P.'s $223,800.00 cash payment to Murad in August of 2012, (2) the reasons for this substantial cash payment (*i.e.,* for Murad's work on the J.P. Rule 35 matter), and (3) the concealment of these funds in Murad's safe deposit box. Murad directed Quinn not to talk to the FBI to prevent the FBI's discovery of Murad's knowing and willful failure to claim the $223,800.00 cash payment from B.P. as income on his 2012 U.S. Individual Income Tax Return.

In February 2014, Murad told Quinn, who had since retired as a Special Agent for the DEA, that the FBI had called him several times wanting to speak with him about the investigation. Murad told Quinn he was not going to call the FBI back. Quinn agreed.

On February 13, 2014, the FBI executed a search warrant on Murad's Bank of America safe deposit box and seized $73,420.00 in U.S. currency. Pursuant to a seizure warrant, the FBI seized $60,139.03 from Murad's Bank of America checking account as well. The seized funds derived from B.P.'s $223,800.00 cash payment to Murad in August 2012.

On February 14, 2014, the day after the search, Murad called Quinn and said he needed to speak with Quinn, but did not want to talk on the telephone. Murad went to Quinn's house in Pinellas County and informed Quinn that the day prior, the FBI had searched and seized the money in Murad's safe deposit box and bank account. Murad questioned how the FBI had obtained probable cause to obtain search and seizure warrants for his account and safe deposit box. Initially, Murad blamed Quinn for this situation and accused Quinn of getting Murad in trouble by saying too much to the FBI. Murad asked Quinn if he told the FBI about B.P. paying Murad or about Murad's safe deposit box. Quinn, however, assured Murad that he had not said anything to the FBI about the payments from B.P. or the money in the safe deposit box. Murad instructed and directed Quinn not to talk to the FBI any further. By doing so, Murad again knowingly attempted to corruptly persuade Quinn not to provide the FBI with incriminating information about B.P.'s $223,800.00 cash payment to Murad and Murad's knowing and willful failure to claim this earned income on his 2012 federal income tax return.

As part of the federal investigation, two AUSAs and two FBI agents interviewed Quinn again on April 17, 2014. Similar to his first interview, Quinn falsely claimed that he did not know if Murad had ever received money from one of J.P.'s family members. Quinn also falsely denied knowing that the FBI had seized money from Murad's safe deposit box and bank account. In addition, Quinn falsely denied talking with Murad about the DEA investigations that led to

the arrests in March 2012 and the Rule 35 efforts on behalf of J.P., even though Murad inquired about and Quinn routinely provided information to Murad about the status of these cases. After being confronted by the FBI, Quinn admitted that he lied to the FBI during his November 2013 and April 2014 interviews.

After Quinn's April 17 interview with the FBI, he again spoke with Murad. Quinn informed Murad that he told the FBI everything. Quinn specified that he told the FBI about Murad receiving money from B.P. in connection with the J.P. Rule 35 matter. Murad responded that Quinn did not see Murad get any money, Quinn only knew Murad got paid because Murad told him so. Murad's comment to Quinn in this regard was designed to make Quinn question whether Murad actually received any money from B.P. Murad again reiterated that he wanted Quinn to stop talking to the FBI. On several subsequent occasions, Murad told Quinn to get an attorney.

The above is merely a summary of some of the events and persons involved and other information relating to this case. It does not include, nor is it intended to include, all of the events, persons involved, or other information relating to this case.

12. <u>Entire Agreement</u>

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13.  Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this _15th_ day of April, 2016.

RACHELLE DESVAUX BEDKE
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515


SAMUEL MURAD
Defendant

JOSEPHINE W. THOMAS
Assistant United States Attorney


GREGORY W. KEHOE
Attorney for Defendant

SIMON A. GAUGUSH
Assistant United States Attorney
Chief, Major Crimes Section